IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Laurel Lawson, James Curtis, and James
Turner, on behalf of themselves and other
similarly-situated persons,

     Plaintiffs,

v.

City of Atlanta, Georgia,

     Defendant.

_____/

CIVIL ACTION FILE
NO. 1:18-cv-02484-SDG

## JOINT MOTION TO APPROVE CLASS CERTIFICATION, THE CLASS ACTION CONSENT DECREE AND TO SET A FAIRNESS HEARING, AND INCORPORATED MEMORANDUM OF LAW

This motion and incorporated memorandum are submitted jointly by Plaintiffs

Laurel Lawson, James Curtis, and James Turner ("Plaintiffs"), individually and on

behalf of all those similarly situated, and Defendant the City of Atlanta, Georgia (the

"City" and collectively with the Plaintiffs, the "Parties"), pursuant to Federal Rule

of Civil Procedure 23(e). The Parties request that the Court approve final class

certification. The Parties submit that the Class Action Consent Decree[1] is fair,

adequate, and reasonable and request that a fairness hearing be scheduled.[2]

---

[1] The Consent Decree is attached hereto as Exhibit A.
[2] The capitalized terms utilized herein retain the same meaning as defined in the Consent Decree unless otherwise specified.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are mobility-impaired individuals who have disabilities recognized by the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Am. Compl. ¶¶ 9, 16, 19, 22. The Plaintiffs rely on accessible sidewalks, curb ramps, pedestrian crossing, and other walkways to meaningfully access and participate in many services, programs, and activities offered to the City's residents and visitors. *Id.*

The City is a public entity within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (the "ADA") and receives federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794. The City is responsible for constructing, maintaining, repairing, and regulating the public right-of-way, including the pedestrian access routes along certain roads within its boundaries and, with regard to the pedestrian access routes along certain other roads, for supervising the adequacy of their maintenance.

On May 24, 2018, the Plaintiffs on behalf of themselves and all others similarly situation, filed a class-action complaint against the City pursuant to Fed. R. Civ. P. 23. The complaint alleges that the City violates Title II of the ADA by failing to maintain sidewalks and other pedestrian access routes in the public right-of-way in a manner that is accessible to individuals with disabilities. On August 3, 2018, Plaintiffs filed an Amended Complaint. *See* ECF No. 12.

From the inception of this lawsuit, Plaintiffs commenced discovery regarding class certification, and the commonality and typicality of the issues involved therein. Further, the Parties engaged in informal settlement negotiations. To further these informal negotiations, the Parties moved to stay the proceedings on multiple occasions. *See* ECF Nos. 54 and 55. Unfortunately, the COVID 19 pandemic hampered the progress of these negotiations and in so doing, it took longer to formalize the resolution of this matter than the Parties anticipated. The Parties stipulated to conditional class certification based on the factual information known to them and to avoid the time and expense of further litigation while the Parties were discussing a potential resolution. ECF No. 73. On April 22, 2021, the Court granted the Parties' Joint Stipulation and Joint Motion for Conditional Class Certification. ECF No. 75.

Shortly thereafter, the Parties began more formal settlement negotiations. Both Parties retained experts in the fields of compliance with the ADA and the Rehabilitation Act, including experience in evaluating pedestrian public rights of way ("PPROW").[3] Throughout this litigation, the Parties exchanged discovery, regarding, among other things, a recent audit of the City's sidewalk infrastructure

---

[3] The term PPROW is defined in the Consent Decree as any sidewalk, crosswalk, curb, curb ramp, walkway, undercrossing, overcrossing, or other pedestrian pathway or walk of any kind that is, in whole or in part, owned, maintained, or controlled by the City, and which may also be referred to as "pedestrian access routes".

and the costs and timing associated with implementing a plan to repair certain of the City's sidewalks and pedestrian rights of way. The Parties also inspected various sidewalk and pedestrian access route locations in the public rights-of-way throughout the City in relation to compliance with Title II of the ADA and the Rehabilitation Act. *See* ECF No. 46 ("Plaintiff's Expert Report"); Declaration of William Hecker attached hereto as Exhibit B (the "Hecker Declaration"). These inspections were to confirm, among other things, commonality relating to the accessibility-related issues presented by the sidewalks and pedestrian access routes in the public right-of-way. *Id.*

## II.   <u>THE CONSENT DECREE</u>

The Consent Decree entered into between the Plaintiffs and the City is designed to ensure the City's program of providing PPROW, when viewed in its entirety, is readily accessible and usable by persons with Mobility Disabilities. The City has hundreds of miles of PPROW over which it has jurisdiction.  These pedestrian access routes provide citizens with access to a range of services offered by the City including, but not limited to, public transportation. The Consent Decree contains a comprehensive analysis of accessibility issues and solutions.

The Agreement calls for the certification of a class of (the "Class"):

All persons who have, or will have, a Mobility Disability and who have been or will have been denied equal access to pedestrian rights of way in the City of Atlanta at any time up through the expiration of this Consent Decree as a result of the City's policies and practices with

regard to design, installation, repair, and maintenance of its pedestrian rights of way.

The Consent Decree specifies alterations that will be made to the PPROW in order to enhance its accessibility to members of the Class and provides a number of provisions to ensure that such alterations are made. A summary of the main modification requirements and compliance mechanisms are set forth below. In large part, these modifications meet the requirements of the ADA and the Rehabilitation Act, and in some instances provide relief to the class which would not otherwise be obtainable at trial.

### A.    Self-Evaluation

The Consent Decree obligates the City to prepare a Self-Evaluation of the Department of Transportation's ("DOT") programs that provide, construct, maintain and repair the pedestrian access routes in the Public Rights-of-Way ("ATL-PPROW Program"). The purpose of the Self-Evaluation is to determine and catalog elements in the PPROW that are not accessible and usable by persons with a Mobility Disability as determined by their lack of conformance to the Accessibility Laws and Accessibility Standards thereby warranting inclusion in the Transition Plan for Sidewalks. The Self-Evaluation will also determine whether there are deficiencies of a non-structural nature in the City's ATL-PPROW Program, including deficiencies with program access. In determining whether an element in the PPROW is accessible, the City will adopt the Public Right-of-Way Accessibility Guidelines

("PROWAG"), developed by the United States Access Board, as its standard for accessibility with regards to PPROW. The Self-Evaluation's purpose is to guide the updating of ATL-PPROW's program through a survey of DOT's programs, activities, and services relating in any material way to the accessibility of the PPROW (the "Accessibility Survey"). The Accessibility Survey will include a survey of DOT's facilities, including but not limited to, the PPROW itself, to determine whether there are physical barriers to accessibility in the PPROW and whether structural, non-structural or even no changes are required for the removal of each such physical barrier. The Self-Evaluation will utilize the data in the PPROW Survey that has already been performed by ARCADIS.  The Arcadis survey will be supplemented by the manual public rights of way survey included in Plaintiffs' expert report prepared by Peter A. Combs between January 8 and February 16, 2020 to the following areas: Inman Park, Downtown/Five Points, West Midtown (Peachtree corridor), Old Fourth Ward, and Vine City, as well as confirmation inspections by the City's independent expert, William Hecker. *See* Plaintiffs' Expert Report and Hecker Declaration. Pursuant to the Consent Decree, the City will commence its Self-Evaluation within 90 days of the entry of the Consent Decree and provide status updates every 90 days beginning 180 days from the entry of the Consent Decree.

### B.    Transition Plan for Sidewalks

The Consent Decree requires the City to draft a Transition Plan for Sidewalks which shall contain, at a minimum, (a) an overview of how the City intends to address the physical barriers that limit the accessibility of the PPROW to individuals with mobility disabilities; (b) a schedule for taking the steps necessary for the PPROW to achieve compliance with Title II of the ADA and the Rehabilitation Act; (c) annual targets for the removal of barriers to the accessibility of the ATL-PPROW Program which may be measured by, among other means, the linear feet of pedestrian corridors to be repaired or replaced, numbers of curb cuts and curb ramps installed, and pedestrian crossings to be repaired or installed; and (d) the name and contact information of the official responsible for the plan's implementation.  The completion date for the Transition Plan for Sidewalks shall be two (2) years from the entry of judgment.

The Transition Plan for Sidewalks shall require that the installation, repair or replacement of sidewalks or pedestrian rights of way take into account the priorities outlined in 28 C.F.R. § 35.150(d)(2), as well as other circumstances not specifically defined within those priorities that may help facilitate the City's completion of the

Transition Plan more expeditiously.[4] The schedule set forth in the Transition Plan for Sidewalks shall generally prioritize the following locations:

1.    Specific PPROW corridors located within Inman Park, Old Fourth Ward, Five Points, Vine City, and West Midtown, which were areas alleged by the Plaintiffs to have barriers in the PPROW.

2.    The PPROW corridors in areas identified in the 2022 TSPLOST Project List.

3.    Selected PPROW corridors providing accessible pedestrian access to MARTA stations.

4.    Selected PPROW corridors providing accessible pedestrian access to certain bus stops that are prioritized after receiving input from the Plaintiffs, public comments, and City staff.

5.    PPROW corridors in the immediate vicinity of state and local government offices, and PPROW corridors in areas of public commerce, selected after receiving input from the Plaintiffs, public comments, and City staff.

In addition to the above-identified prioritized areas, the Consent Decree requires the City to hold public meetings prior to finalizing the Transition Plan for

---

[4] For example, TSPLOST funded projects may provide accelerated funding for sidewalk repair in PROW corridors eligible for TSPLOST financing even when such corridors are not the highest priority corridors not yet completed in the Transition Plan relative to the priorities set forth in 28 C.F.R. § 35.150(d)(2).

Sidewalks in order for interested community members, disabled persons, and community organizations to provide input to City staff on the final prioritization of areas to undergo barrier removal.

Notwithstanding the prioritization methodology described above, the Consent Decree further provides that the Transition Plan shall prioritize complaints received from interested parties through the 3-1-1 system after such complaints have been reviewed by the DOT ADA Coordinator and City staff.

### C.    Removal of Barriers to Accessibility in Pedestrian Right-of-Way

Based on data obtained from the Self-Evaluation including but not limited to the Accessibility Survey, the Transition Plan for Sidewalks shall contain generalized cost estimates to bring all existing PPROW into compliance. Pursuant to the terms of the Consent Decree, the City shall have twenty-five (25) years to remove the barriers to access identified in the Transition Plan for Sidewalks and bring the City into compliance with Title II of the ADA and the Rehabilitation Act. The Consent Decree provides that it may be terminated early if the City has removed the barriers in a period of fifteen (15) years.

### D.    Reporting and Monitoring the Progress Under the Transition Plan for Sidewalks

The DOT ADA Coordinator or his or her designee will be tasked with maintaining all records of all worked performed and completed under the Transition Plan for Sidewalks and shall be responsible for furnishing such records as set forth

in the Consent Decree. The City shall also retain a Monitor with substantial experience in evaluating or assisting public entities in coming into compliance with Accessibility Standards. The Monitor will prepare reports (on an annual basis for years 1-12 and bi-annually for years 13-25) providing a summary of all complaints received by the City relating to the PPROW, a summary of all repairs to remove barriers to access in the PPROW, updates on any cost estimates set forth in the Self-Evaluation or the Transition Plan for Sidewalks, an evaluation of the City's progress towards compliance with the ADA and the Rehabilitation Act, and descriptions of any delays. The Monitor is also tasked with randomly selecting and inspecting up to 10% of the locations in the PPROW where barriers were removed for that reporting period. If the Monitor determines that barriers were not removed in the areas inspected, then the City shall have 30 days to remedy or make provisions for removal of any identified remaining barriers or determine that there is a dispute regarding such barriers.

The Consent Decree provides for payment of the costs of monitoring at a maximum hourly rate of $375 for a qualified monitor. Total monitor fees shall not exceed $20,000 per year for years 1-12, and $10,000 per year for years 13-25.

### E.   ADA Coordinator

The Consent Decree obligates the City to create and maintain the position of DOT ADA Coordinator. The DOT ADA Coordinator will be responsible for, among

other things, overseeing tasks related to the development and implementation of the DOT's Self-Evaluation and Transition Plan for Sidewalks, assisting in the resolution of complaints received through the 3-1-1 system, designing DOT's policies and procedures regarding the accessibility of the ATL-PPROW Program, and overseeing the City's efforts to maintain accessibility in the PPROW.

### F.    Training of City Personnel

The Consent Decree requires the DOT ADA Coordinator to develop and provide, or facilitate training to, all city staff whose jobs entail reviewing plans and/or inspecting the PPROW for compliance with the Accessibility Standards.  The City will also include this training in its new hire orientation for such staff, unless the newly hired staff possess sufficient knowledge of the Accessibility Laws and Accessibility Standards due to prior training and experience as determined by the DOT Commissioner and the DOT ADA Coordinator.

### G.    Intake and Resolution of Complaints Regarding Barriers to Accessibility in the PPROW

The Consent Decree contemplates that the City will provide a means of submitting complaints or information regarding accessibility-related barriers in the PPROW within the City's current "3-1-1" system. In so doing, the City will add an additional category to its current 3-1-1 system to ensure that complaints regarding ATL-PPROW are segregated from complaints that do not involve ATL-PPROW and

are routed to and processed by DOT. DOT will then prioritize complaints related to the ATL-PPROW once it receives them.

## H.    Removal of Barriers Identified in Complaints or Grievances

The City is obligated to prepare and implement written polices, practices and procedures to ensure the timely triaging, processing, and evaluation of complaints or grievances regarding barriers to accessibility in the PPROW through the City's "3-1-1" system. The City is obligated to then commence the removal of the complained of barrier. The complainant shall be notified if, upon initial evaluation of the complaint or grievance, the barrier will likely not be removed within 180 days, or work to remove the complained of barrier will not be substantially underway within 90 days.

Further, to the extent the barrier complained of will take longer than 180 days or the work will not be substantially underway within 90 days, the City will be obligated to notify the Complainant of this and why the removal will take longer. A member of City staff will also communicate with the complainant regarding possible alternative accessible routes while the complained of barrier is being removed or remediated.

In addition to the Complaint Procedure, the Consent Decree also obligates the City to create a DOT Grievance Procedure in order to address appeals from Class members who are dissatisfied with the City's actions in response to the complaint.

Appeals may be taken on the basis that the repair or project still does not comply with the Consent Decree, is taking longer than the complainant believes it should, or the complainant has other complaints relating to accessibility in or usability of the PPROW or program access in the PPROW.

### I. City Policies, Practices and Procedures to Maintain Ongoing Accessibility in the PPROW

The Consent Decree requires the City to ensure that its permitting and approval process requires all third parties who perform construction, alterations, or development projects that relate to the PPROW do so in a manner that complies with the Accessibility Standards. Additionally, the City will implement policies, practices, and procedures such that when applications for building permits involving the site, exterior of existing buildings, or for new construction are reviewed to determine if the proposed improvements set forth in the permit drawings contain, or as a consequence of the improvements will or may require any intersection with, connection to, modification of, or improvements to the PPROW, and if so, the applicant shall submit an application for and attain the appropriate DOT permit, prior to the issuance of the building permit. Prior to DOT's issuance of a DOT permit that affects the PPROW, the permit shall be reviewed for compliance with the Accessibility Standards.

If the contemplated project will or could reasonably be expected to create barriers to accessibility of the PPROW at any time during the duration of the project,

then the Maintenance of Traffic ("MOT") plan that is submitted as part of the DOT permit application shall, among the application's other requirements, indicate where, at any time during the duration of the project, accessibility of the PPROW may be limited, eliminated or otherwise compromised, even if such accessibility barriers are expected to be present only for a short period of time.  The MOT shall further provide for maintaining the accessibility of the PPROW, including by such means as providing, and indicating such by signage, alternative accessible pedestrian routes during the duration of the project.  Finally, the City will enact written policies and procedures to enforce the City's current code requirements ensuring access to PPROW, including but not limited to codes regarding barriers caused by signage, tables and chairs, and other items installed or erected on or in pedestrian access routes by third-parties.

**J.    Private (Non-City) Parties Using the PPROW for Normal Business Operations**

The Consent Decree requires the City to implement and maintain policies and procedures relating to the enforcement of the City's code requirements ensuring access to PPROW, including but not limited to barriers caused by signage, tables and chairs, and other items installed or erected by third-parties for normal business operations. The policies and procedures shall indicate that the City shall only allow the encroaching or obstructing the PPROW as authorized by permit whose

14

application requirements shall also require the identification of an alternate accessible route.

### K.    Access During Special Events

The City is required to implement policies and procedures to provide alternate, accessible routes in the PPROW through and around areas where conditions during special events prohibit full access to the PPROW. The City will work with the third-party contractors and producers for special events to make reasonable accommodations for persons with Mobility Disabilities during special events including identifying temporary accessible alternative routes and posting descriptions of such routes on the City's website.

### L.    Dispute Resolution Procedure

The Parties have drafted an extensive dispute resolution procedure to the extent there are disputes relating to the requirements or interpretation of the Consent Decree. As set forth in the Consent Decree, disputes shall be brought to the attention of the other party as soon as possible. The Parties shall then have thirty days to resolve the dispute, and if it is not resolved in thirty days, the Parties may submit the issue to a mediator. If the issue is not resolved through mediation, then the issue will be presented to the Court.

**M.    Administrative Preconditions and Approvals**

The City is a municipal corporation of the State of Georgia, and as such, the City is vested with the powers granted to, and limitations imposed thereupon, municipal corporations by the laws of Georgia, and by the City's Charter and ordinances. The Parties acknowledge and agree that the City must comply with the laws of the State of Georgia, the City's Charter and Code of Ordinances including but not limited to, the City's Procurement and Real Estate Code, even when performing obligations set forth upon it by the Consent Decree. To the extent compliance with the procedures set forth in the City's Procurement and Real Estate Code cause the completion dates of obligations to be delayed, the City will not be in breach or violation of the Consent Decree provided the City gives written notice to Class Counsel and the Monitor of the delay, the reasons for the delay, the anticipated date of completion, and acts in good-faith to effect implementation as soon as practicable. This subsection of the Consent Decree is not intended to alleviate the City of any of the substantive obligations imposed upon it in the Consent Decree.

**N.    Notice of Class Action**

Because class certification is sought solely pursuant to Federal Rules of Civil Procedure 23(b)(1) or 23(b)(2), notice to class members of the certification is not required and class members may not opt out. *See* Fed. R. Civ. P. 23(c)(2); Newberg on Class Actions § 8.13. Notice need not be given of the certification of the class.

Federal Rule of Civil Procedure 23(e) provides that notice of the proposed dismissal or compromise of a class action shall be given to all members of the class "in a reasonable manner." In part, because of the size of the class, notice to individual class members is impractical.

The Consent Decree sets forth how notice can be achieved as follows: (1) within thirty (30) days after the Court issues the Preliminary Approval Order, the City will cause the Notice of Settlement to be published for four (4) consecutive weeks in *The Atlanta Journal-Constitution* (in English and Spanish), *The Fulton County Daily Report* (in English and Spanish), *The Champion Newspaper* (in English and Spanish), and *Mundo Hispanico* (in Spanish); (2) within twenty (20) days after the Court issues the Preliminary Approval Order, the City will cause the Notice of Settlement to be published on the City's official website (www.atlantaga.gov) for four consecutive weeks; (3) within ten (10) days after the Court issues the Preliminary Approval Order, Class Counsel will provide the Notice of Settlement to the disability rights organizations listed in the Exhibit D to the Consent Decree; and (4) within twenty (20) days after the Court issues Preliminary Approval Order, Class Counsel will post on their website a copy of the Notice of Settlement in English and Spanish.

### O.  Release

The release by the Class is narrowly tailored to the litigation at hand. This litigation solely releases the City from claims for injunctive or declaratory relief relating to the subject matter that was alleged, could have been alleged, or could be alleged by any class member throughout the term of the Consent Decree. The release expressly does not include claims for monetary damages, personal injuries, or property damage resulting from PPROW that do not comply with the ADA. Further, the release does not apply to claims based on accessibility barriers that remain in existence after the expiration of the Consent Decree or claims to enforce the terms of the Consent Decree. *Desue v. 20/20 Eye Care Network, Inc.,* No. 21-CIV-61275-RAR, 2023 WL 4420348, at *3 (S.D. Fla. July 8, 2023) ("The release is narrowly tailored to release only those claims that could have been brought against the "Released Parties.").

### P.  Attorneys' Fees and Costs

The Consent Decree provides for payment of Plaintiffs' attorneys fees and costs. Class counsel shall submit an application requesting entry of an award of attorneys' fees and expenses at least twenty (20) days prior to the deadline for Class members to submit objections to this Consent Decree. The Parties have exchanged information regarding the work performed by Plaintiff's counsel and the expenses advanced and have agreed that an award of $600,000 in attorneys' fees and costs is

presumptively reasonable. The Consent Decree further provides for payment of Class Counsel's attorneys' fees during the monitoring period of up to $625,000, upon submission of invoices, which are subject to review for reasonableness. Class counsel may apply, after fifteen (15) years for additional funds upon a showing that such funds are necessary reasonably to enforce the Consent Decree.

## III.  ARGUMENT REGARDING FAIRNESS OF THE SETTLEMENT AGREEMENT

The Parties jointly move this Court for an order approving the Consent Decree reached between the Parties and settling this case. Under Federal Rule of Civil Procedure 23(e), the Court has responsibility for reviewing and approving settlement of class action cases. In addition to adherence to adequate procedures, the Court evaluates whether the settlement is fundamentally fair, adequate and reasonable. Fed. R. Civ. P. 23(e). The agreement between the Parties fulfills the mandate of the ADA and the Rehabilitation Act by creating clear and comprehensive guidance to ensure that the City's PPROW is accessible to individuals with disabilities. *See Assoc. for Disabled Amer. v. Amoco Oil Co.,* 211 F.R.D. 457, 467 (S.D. Fla. 2002).

In considering the fairness of a proposed settlement of a class action, the Court must recognize that "compromise is the essence of settlement." *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984). To evaluate the fairness of the Consent Decree, the Court should consider (1) the likelihood of success at trial on the merits; (2) the range of possible recovery; (3) the point on or below the range of possible

recovery at which a settlement is fair; (4) the complexity, expense and duration of the litigation; (5) the substance of the objections and reaction of class members; and (6) the state of proceedings at which the settlement is achieved. *Id.; see also Columbus Drywall & Insulation, Inc. v. Masco Corp.,* No. 1:04-cv-3066-JEC, 2012 WL 12906499, at *2 (N.D. Ga. Oct. 26, 2012). A class action settlement should be approved so long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett,* 737 F.2d at 986.

The Parties agree that the projected outcome of the litigation is uncertain and approval of this settlement would promote judicial economy because litigation, trial, and a potential appeal of this matter would demand significant resources from the Parties and the Court, including fact and expert discovery, as well as data analysis. This case involves questions of law regarding, among other things, the application of the statute of limitations governing claims brought pursuant to Title II of the ADA to alterations previously performed by the City that were allegedly not in compliance with the Accessibility Standards, which could create a risk as to how robust and compressive the injunctive relief could be. The approval of the settlement solves this issue.

A trial on the merits of the issue regarding the accessibility of PPROW and curb ramps would require an analysis of thousands of curb ramps and hundreds of miles of sidewalk to determine if those sidewalks and curb ramps comply with the

ADA and the Rehabilitation Act either by literal conformance with the Accessibility Laws and/or Accessibility Standards, or by providing program accessibility.[5] Testimony relating to this many curb ramps along with enormous amount of square footage of sidewalk would be unwieldy. Additionally, even if the sidewalks and curb ramps do not comply with the ADA or the Rehabilitation Act by conforming to the Accessibility Laws and or Accessibility Standards, or by providing program accessibility, Plaintiffs still must demonstrate through admissible evidence that it is technically feasible for the City to make the alterations they are requesting for each sidewalk and curb ramp they are contending needs alterations. Rather than taking this case to trial, the modifications proposed by the Consent Decree will provide the disability community with immediate and sustained relief, provide for judicially enforceable modifications, and guarantee several forms of relief which might not otherwise be available at trial, such as an accessibility coordinator devoted to the Department of Transportation, prioritization of PPROW corridors that the disabled community has identified, and a narrowly tailored released as opposed to *res judicata*.

In addition to the matters discussed above supporting approval of the Consent Decree, the Consent Decree is not the product of collusion, and class counsel and counsel for the City have vigorously represented their respective clients' interests.

---

[5] *See* 28 C.F.R. § 35.150(a) and (b).

Throughout this litigation, the Parties have exchanged discovery regarding a recent audit of the City's sidewalk infrastructure, the costs associated with implementing a plan to repair the City's PPROW, and how the City proposes to pay for repairs to the City's PPROW. Class counsel, along with their expert, personally inspected the PPROW throughout representative areas of the City. Further, the Parties each retained experts qualified to render opinions regarding the accessibility of the City's PPROW. Counsel for the Plaintiffs conferred extensively with the Plaintiffs during the long course of intensive settlement negotiations spanning multiple years. The proposed resolution of this case is based on Plaintiffs' expert's inspection of various sections of the City's PPROW, confirmation inspections of the same sections of the City's PPROW by the City's independent expert, relevant information provided during discovery, the experts' review of the PPROW, and extensive detailed discussions and negotiations among Plaintiffs, Defendants, experts and attorneys regarding the implementation of certain policies and modifications that might be made to the City's PPROW to increase its accessibility to individuals with disabilities.  As detailed above, the terms of the Consent Decree require the City to make numerous and substantial modifications to the sidewalks and pedestrian rights of way, including to the policies related thereto, thereby greatly enhancing the accessibility of the City's sidewalks and pedestrian rights of way for all persons with disabilities.

The fact that the Plaintiffs have been able to obtain such broad relief is indicative of the parties having negotiated in good faith at arms' length. *Amoco Oil Co.,* 211 F.R.D. at 470-471. This Court is entitled to rely upon the judgment of experienced counsel, as well as the Plaintiffs. Here, counsel for the Plaintiffs has experience both in litigating matters involving the ADA and the Rehabilitation Act, as well as class actions. *See, e.g., Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977); *see also Ingram v. The Coca-Cola Co.,* 200 F.R.D. 685, 691 (N.D. Ga. 2001); *see also* Declaration of James Radford attached as Exhibit C; Declaration of Andrew Coffman attached as Exhibit D.  The proposed notice to the class is calculated, under all circumstances, to provide class members with the reasonable notice of the settlement." *See Faught v. Am. Home Shield Corp.,* 668 F. 3d 1233, 1239 (11th Cir. 2011) (citing *In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1104-1105 (5th Cir. 1977).

Typically, notice by publication is regarded as sufficient to encourage those with divergent views to come forward to help the trial court identify possible inadequacies in the settlement. *Greco v. Ginn Develop. Co., LLC,* 635 Fed. Appx. 628, 634-635 (11th Cir. 2015); *Faught,* 668 F.3d at 1239 (11th Cir. 2011). Such notice by publication is adequate and plainly would encourage individuals who disagreed with the Consent Decree to come forward and to identify any perceived inadequacies in the Consent Decree. Publication as provided for in the Consent

Decree is reasonably calculated to reach a representative cross-section of members of the disabled community and their advocates. The notice "amply accomplished the purposes for which due process requires such notice, namely, to 'assure that before settlements receive judicial approval the court be well informed of the views of those who feel that they are being called upon to make the sacrifices." *Battle v. Liberty Nat'l Life Ins. Co.,* 770 F. Supp. 1499, 1521 (N.D. Ala. 1991), *aff'd* 974 F.2d 1279 (11th Cir. 1992), quoting *Mandujano v. Basic Vegetable Prods., Inc.,* 541 F.2d 832, 835 (9th Cir. 1976).

**WHEREFORE,** the Plaintiffs Laurel Lawson, James Curtis, and James Turner, individually and on behalf of all those similarly situated, and Defendant the City of Atlanta, Georgia, respectfully move this Court to (a) approve final class certification under Fed. R. Civ. P. 23(b)(2); and (b) find the proposed Consent Decree is fundamentally fair, adequate, reasonable, and not the product of collusion between the Parties, and satisfies all of the factors set forth in *Bennet,* 737 F.2d at 986, and (b)  that a fairness hearing be held no earlier than 90 days after the entry of approval. A proposed order is attached for the Court's convenience which is also attached as Exhibit B to the Consent Decree.

Dated: August 25, 2023

**COUNSEL FOR PLAINTIFFS**

/s/ Andrew Y. Coffman
Andrew Y. Coffman
Georgia Bar No. 173115
A. Lee Parks, Jr.
Georgia Bar No. 563750
J. Daniel Cole
Georgia Bar No. 450675
**PARKS, CHESIN & WALBERT, P.C.**
75 Fourteenth Street, 26th Floor
Atlanta, GA 30309
Telephone: 404-873-8000
Facsimile: 404-873-8050
acoffman@pcwlawfirm.com
lparks@pcwlawfirm.com
dcole@pcwlawfirm.com

/s/ James E. Radford
James E. Radford
Georgia Bar No. 108007
Regan E. Keebaugh
Georgia Bar No. 585500
Georgia Lord
Georgia Bar No.  447932
**RADFORD & KEEBAUGH, LLC**
315 W. Ponce de Leon Ave. @1080
Decatur, GA 30030
Telephone: 678-271-0300
james@decaturlegal.com
regan@decaturlegal.com
georgia@decaturlegal.com

**COUNSEL FOR DEFENDANT**

**GREENBERG TRAURIG, LLP**
Terminus 200, Suite 2500
333 Piedmont Road NE
Atlanta, Georgia 30305
Telephone: (678) 553-2100
Facsimile:  (678) 553-4745

/s/ Richard J. Valladares
RICHARD J. VALLADARES
Georgia Bar No. 611066
Valladaresr@gtlaw.com

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile:  (305) 579-0717

ROBERT S. FINE (*pro hac vice*)
Florida Bar No. 155586
Email: FineR@gtlaw.com
ROBERT S. GALBO (*pro hac vice*)
Florida Bar No. 106937
Email: GalboR@gtlaw.com
ELISA H. BACA (*pro hac vice*)
Florida Bar No. 1003009
Email: BacaE@gtlaw.com

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1D

I hereby certify that the foregoing document was prepared in Times New Roman, 14-point font, as provided by Local Rule 7.1D.

s/ Richard J. Valladares
Richard J. Valladares
Georgia Bar No. 611066

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing **JOINT MOTION TO APPROVE CLASS CERTIFICATION, CLASS ACTION CONSENT DECREE AND TO SET A FAIRNESS HEARING** with the Clerk of Court using the CM/ECF system which will automatically send electronic notification of such filing to all counsel of record:

This 25th day of August, 2023.

s/ Richard J. Valladares
Richard J. Valladares
Georgia Bar No. 611066
