IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Laurel Lawson, James Curtis, and James
Turner, on behalf of themselves and other
similarly-situated persons,

     Plaintiffs,

v.

City of Atlanta, Georgia,

     Defendant.

_____/

CIVIL ACTION FILE
NO. 1:18-cv-02484-SDG

## JOINT MOTION FOR FINAL APPROVAL OF THE CLASS ACTION CONSENT DECREE AND INCORPORATED MEMORANDUM OF LAW

This motion and incorporated memorandum are submitted jointly by Plaintiffs

Laurel Lawson, James Curtis, and James Turner ("Plaintiffs"), individually and on

behalf of all those similarly situated, and Defendant the City of Atlanta, Georgia (the

"City" and collectively with the Plaintiffs, the "Parties"), pursuant to Federal Rule

of Civil Procedure 23(e). The Parties request that the Court approve final class

certification and the Class Action Consent Decree. The Parties submit that the Class

Action Consent Decree[1] is fair, adequate, and reasonable.[2]

---

[1]     The Class Action Consent Decree is attached hereto as Exhibit A.
[2]     The capitalized terms utilized herein retain the same meaning as defined in the Consent Decree unless otherwise specified.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are mobility-impaired individuals who have disabilities recognized by the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Am. Compl. ¶¶ 9, 16, 19, 22. The Plaintiffs rely on accessible sidewalks, curb ramps, pedestrian crossings, and other walkways to meaningfully access and participate in many services, programs, and activities offered to the City's residents and visitors. *Id.*

The City is a public entity within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (the "ADA") and receives federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794. The City is responsible for constructing, maintaining, repairing, and regulating the public right-of-way, including the pedestrian access routes along certain roads within its boundaries and, with regard to certain other pedestrian access routes, supervising the adequacy of their maintenance.

On May 24, 2018, the Plaintiffs, on behalf of themselves and all others similarly situated, filed a class-action complaint against the City pursuant to Fed. R. Civ. P. 23. The complaint alleges that the City violates Title II of the ADA by failing to maintain sidewalks and other pedestrian access routes in the public right-of-way in a manner that is accessible to individuals with disabilities. On August 3, 2018, Plaintiffs filed an Amended Complaint. *See* ECF No. 12.

From the inception of this lawsuit, Plaintiffs commenced discovery regarding class certification, and the commonality and typicality of the issues involved therein. Further, the Parties commenced informal settlement negotiations. To further these informal negotiations, the Parties moved to stay the proceedings on multiple occasions. *See* ECF Nos. 54 and 55. Unfortunately, the COVID 19 pandemic hampered the progress of these negotiations and in so doing, it took longer to formalize the resolution of this matter than the Parties anticipated. The Parties stipulated to conditional class certification based on the factual information known to them and to avoid the time and expense of further litigation while the Parties were discussing a potential resolution. ECF No. 73. On April 22, 2021, the Court granted the Parties' Joint Stipulation and Joint Motion for Conditional Class Certification. ECF No. 75.

Shortly thereafter, the Parties began more formal settlement negotiations. Both Parties retained experts in the fields of compliance with the ADA and the Rehabilitation Act, including experience in evaluating pedestrian public rights-of-way ("PPROW").[3] Throughout this litigation, the Parties exchanged discovery, regarding, among other things, a recent audit of the City's sidewalk infrastructure

---

[3] The term PPROW is defined in the Consent Decree as any sidewalk, crosswalk, curb, curb ramp, walkway, undercrossing, overcrossing, or other pedestrian pathway or walk of any kind that is, in whole or in part, owned, maintained, or controlled by the City, and which may also be referred to as "pedestrian access routes".

and the costs and timing associated with implementing a plan to repair certain of the City's sidewalks and PPROW. The Parties also inspected various sidewalk and pedestrian access route locations in the public rights-of-way throughout the City in relation to compliance with Title II of the ADA and the Rehabilitation Act. *See* ECF No. 46 containing Plaintiffs' Expert Report; ECF No. 94 attaching Declaration of Bill Hecker as Exhibit I. These inspections were to confirm, among other things, commonality relating to the accessibility-related issues presented by the sidewalks and pedestrian access routes in the public right-of-way. *Id.*

On August 25, 2023, the Parties filed a Joint Motion to Approve Class Certification, the Class Action Consent Decree, and to Set a Fairness Hearing [ECF No. 94]. On January 25, 2024, the Court granted the Joint Motion, in which it, among other things: (i) certified a Class for declaratory and injunctive relief; (ii) preliminarily approved the Consent Decree; (iii) approved the form and content of the proposed Notice of Settlement; (iv) ordered that a fairness hearing be held; and (v) set forth a procedure for any Class Member to object [ECF No. 95].

## II.    **THE CONSENT DECREE**

The Consent Decree entered into between the Plaintiffs and the City is designed to ensure the City's program of providing PPROW, when viewed in its entirety, is readily accessible and usable by persons with Mobility Disabilities. The City has hundreds of miles of PPROW over which it has jurisdiction.    These

pedestrian access routes provide residents and visitors with access to a range of services offered by the City including, but not limited to, public transportation and other essential government services. The Consent Decree contains a comprehensive analysis of accessibility issues and solutions.

The Consent Decree calls for the certification of a class of (the "Class"):

All persons who have, or will have, a Mobility Disability and who have been or will have been denied equal access to pedestrian rights of way in the City of Atlanta at any time up through the expiration of this Consent Decree as a result of the City's policies and practices with regard to design, installation, repair, and maintenance of its pedestrian rights of way.

The Consent Decree specifies alterations that will be made to the PPROW in order to enhance its accessibility to members of the Class and provides a number of provisions to ensure that such alterations are made. A summary of the main modification requirements and compliance mechanisms are set forth below. In large part, these modifications meet the requirements of the ADA and the Rehabilitation Act, and in some instances provide relief to the class which would not otherwise be obtainable at trial.

## A.    Self-Evaluation

The Consent Decree obligates the City to prepare a Self-Evaluation of the Department of Transportation's ("DOT") programs that provide, construct, maintain and repair the pedestrian access routes in the Public Rights-of-Way ("ATL-PPROW Program"). The purpose of the Self-Evaluation is to determine and catalog elements

in the PPROW that are not accessible and usable by persons with a Mobility Disability as determined by their lack of conformance to the Accessibility Laws and Accessibility Standards thereby warranting inclusion in the Transition Plan for Sidewalks. The Self-Evaluation will also determine whether there are deficiencies of a non-structural nature in the City's ATL-PPROW Program, including deficiencies with program access. In determining whether an element in the PPROW is accessible, the City will adopt the Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way (commonly referred to as the Public Right-of-Way Accessibility Guidelines or "PROWAG"), developed by the United States Access Board,[4] as its standard for accessibility with regards to PPROW and recently issued as a final rule of the agency, 88 FR 53604 (August 8, 2023). The Self-Evaluation's purpose is to guide the updating of ATL-PPROW's program through a survey of DOT's programs, activities, and services relating in any material way to the accessibility of the PPROW (the "Accessibility Survey"). The Accessibility Survey will include a survey of DOT's facilities, including but not limited to, the PPROW itself, to determine whether there are physical barriers to accessibility in the PPROW and whether structural, non-structural, or even no changes are required for the removal of each such physical barrier. The Self-Evaluation will utilize the

---

[4]     Also known as the Architectural and Transportation Barriers Compliance Board.

data in the PPROW Survey that has already been performed by ARCADIS.[5]   The

ARCADIS survey will be supplemented by the manual PPROW survey included in

Plaintiffs' expert report prepared by Peter A. Combs between January 8 and

February 16, 2020 to the following areas: Inman Park, Downtown/Five Points, West

Midtown (Peachtree corridor), Old Fourth Ward, and Vine City, as well as

confirmation inspections of the same areas by the City's independent expert, Bill

Hecker. *See* Plaintiffs' Expert Report and Hecker Declaration. Pursuant to the

Consent Decree, the City will commence its Self-Evaluation within 90 days of the

entry of the Consent Decree and provide status updates every 90 days beginning 180

days from the entry of the Consent Decree.

### B.    Transition Plan for Sidewalks

The Consent Decree requires the City to draft a Transition Plan for Sidewalks

which shall contain, at a minimum, (a) an overview of how the City intends to

address the physical barriers that limit the accessibility of the PPROW to individuals

with mobility disabilities; (b) a schedule for taking the steps necessary for the

PPROW to achieve compliance with Title II of the ADA and the Rehabilitation Act;

(c) annual targets for the removal of barriers to the accessibility of the ATL-PPROW

Program which may be measured by, among other means, the linear feet of

---

[5]    ARCADIS is an international design and engineering firm that was engaged by the City to
perform a comprehensive survey of the City's sidewalks using state-of-the-art pulsed laser (known
as Lidar) technology.

pedestrian corridors to be repaired or replaced, numbers of curb cuts and curb ramps installed, and pedestrian crossings to be repaired or installed; and (d) the name and contact information of the official responsible for the Transition Plan's implementation. The completion date for the Transition Plan for Sidewalks shall be two (2) years from the entry of judgment.

The Transition Plan for Sidewalks shall require that the installation, repair, or replacement of sidewalks or PPROWs take into account the priorities outlined in 28 C.F.R. § 35.150(d)(2), as well as other circumstances not specifically defined within those priorities that may facilitate the City's completion of the Transition Plan more expeditiously.[6] The schedule set forth in the Transition Plan for Sidewalks shall generally prioritize the following locations:

1.      Specific PPROW corridors located within Inman Park, Old Fourth Ward, Five Points, Vine City, and West Midtown, which were areas alleged by the Plaintiffs to have barriers in the PPROW.

2.      The PPROW corridors in areas identified in the 2022 TSPLOST[7] Project List.

---

[6]      For example, TSPLOST funded projects may provide accelerated funding for sidewalk repair in PPROW corridors eligible for TSPLOST financing even when such corridors are not the highest priority corridors not yet completed in the Transition Plan relative to the priorities set forth in 28 C.F.R. § 35.150(d)(2).

[7]      TSPLOST means Transportation Special Purpose Local Option Sales Tax.

3.      Selected PPROW corridors providing accessible pedestrian access to MARTA stations.

4.      Selected PPROW corridors providing accessible pedestrian access to certain bus stops that are prioritized after receiving input from the Plaintiffs, public comments, and City staff.

5.      PPROW corridors in the immediate vicinity of state and local government offices, and PPROW corridors in areas of public commerce, selected after receiving input from the Plaintiffs, public comments, and City staff.

In addition to the above-identified prioritized areas, the Consent Decree requires the City to hold public meetings prior to finalizing the Transition Plan for Sidewalks for interested community members, disabled persons, and community organizations to provide input to City staff on the final prioritization of areas to undergo barrier removal.

Notwithstanding the prioritization methodology described above, the Consent Decree further provides that the Transition Plan shall prioritize complaints received from interested parties through the 3-1-1 system after such complaints have been reviewed by the DOT ADA Coordinator and City staff.

**C.    Removal of Barriers to Accessibility in Pedestrian Right-of-Way**

Based on data obtained from the Self-Evaluation including but not limited to the Accessibility Survey, the Transition Plan for Sidewalks shall contain generalized

cost estimates to bring all existing PPROW into compliance. Pursuant to the terms of the Consent Decree, the City shall have twenty-five (25) years to remove the barriers to access identified in the Transition Plan for Sidewalks and bring the City into compliance with Title II of the ADA and the Rehabilitation Act. The Consent Decree provides that it may be terminated early if the City has removed the barriers in a period of fifteen (15) years.

### D.    Reporting and Monitoring the Progress Under the Transition Plan for Sidewalks

The DOT ADA Coordinator or his or her designee will be tasked with maintaining all records of all work performed and completed under the Transition Plan for Sidewalks and shall be responsible for furnishing such records as set forth in the Consent Decree. The City shall also retain a Monitor with substantial experience in evaluating or assisting public entities in coming into compliance with Accessibility Standards. The Monitor will prepare reports (on an annual basis for years 1-12 and bi-annually for years 13-25) providing a summary of all complaints received by the City relating to the PPROW, a summary of all repairs to remove barriers to access in the PPROW, updates on any cost estimates set forth in the Self-Evaluation or the Transition Plan for Sidewalks, an evaluation of the City's progress towards compliance with the ADA and the Rehabilitation Act, and descriptions of any delays. The Monitor is also tasked with randomly selecting and inspecting up to 10% of the locations in the PPROW where barriers were removed for that reporting

period. If the Monitor determines that barriers were not removed in the areas inspected, then the City shall have 30 days to remedy or make provisions for removal of any identified remaining barriers or determine that there is a dispute regarding such barriers.

The Consent Decree provides for payment of the costs of monitoring at a maximum hourly rate of $375 for a qualified monitor. Total monitor fees shall not exceed $20,000 per year for years 1-12, and $10,000 per year for years 13-25.

### E.    ADA Coordinator

The Consent Decree obligates the City to create and maintain the position of DOT ADA Coordinator. The DOT ADA Coordinator will be responsible for, among other things, overseeing tasks related to the development and implementation of the DOT's Self-Evaluation and Transition Plan for Sidewalks, assisting in the resolution of complaints received through the 3-1-1 system, designing DOT's policies and procedures regarding the accessibility of the ATL-PPROW Program, and overseeing the City's efforts to maintain accessibility in the PPROW.

### F.    Training of City Personnel

The Consent Decree requires the DOT ADA Coordinator to develop and provide, or facilitate training to, all City staff whose jobs entail reviewing plans and/or inspecting the PPROW for compliance with the Accessibility Standards. The City will also include this training in its new hire orientation for such staff, unless

the newly hired staff possess sufficient knowledge of the Accessibility Laws and Accessibility Standards due to prior training and experience as determined by the DOT Commissioner and the DOT ADA Coordinator.

### G.    Intake and Resolution of Complaints Regarding Barriers to Accessibility in the PPROW

The Consent Decree requires the City to provide a means of submitting complaints or information regarding accessibility-related barriers in the PPROW within the City's current "3-1-1" system. In so doing, the City will add an additional category to its current 3-1-1 system to ensure that complaints regarding ATL-PPROW are segregated from complaints that do not involve ATL-PPROW and are routed to and processed by DOT. DOT will then prioritize complaints related to the ATL-PPROW once it receives them.

### H.    Removal of Barriers Identified in Complaints or Grievances

The City is obligated to prepare and implement written polices, practices and procedures to ensure the timely triaging, processing, and evaluation of complaints or grievances regarding barriers to accessibility in the PPROW through the City's "3-1-1" system. The City is obligated to then commence the removal of the complained of barrier.

Further, to the extent the barrier complained of will take longer than 180 days or the work will not be substantially underway within 90 days, the City will be obligated to notify the Complainant of this and why the removal will take longer. A

member of City staff will also communicate with the complainant regarding possible alternative accessible routes while the complained of barrier is being removed or remediated.

In addition to the Complaint Procedure, the Consent Decree also obligates the City to create a DOT Grievance Procedure in order to address appeals from Class members who are dissatisfied with the City's actions in response to the complaint. Appeals may be taken on the basis that the repair or project does not comply with the Consent Decree, is taking longer than the complainant believes it should, or the complainant has other complaints relating to accessibility in or usability of the PPROW or program access in the PPROW.

## I.    City Policies, Practices, and Procedures to Maintain Ongoing Accessibility in the PPROW

The Consent Decree requires the City to ensure that its permitting and approval process requires all third parties who perform construction, alterations, or development projects that relate to the PPROW do so in a manner that complies with the Accessibility Standards. Additionally, the City will implement policies, practices, and procedures such that applications for building permits involving the site, exterior of existing buildings, or for new construction will be reviewed to determine if the proposed improvements set forth in the permit drawings contain, or as a consequence of the improvements will or may require any intersection with, connection to, modification of, or improvements to the PPROW. If so, the applicant

shall be required to submit an application for and attain the appropriate DOT permit, prior to the issuance of the building permit. Prior to DOT's issuance of a DOT permit that affects the PPROW, the permit shall be reviewed for compliance with the Accessibility Standards.

If the contemplated project will or could reasonably be expected to create barriers to accessibility of the PPROW at any time during the duration of the project, then the Maintenance of Traffic ("MOT") plan that is submitted as part of the DOT permit application shall, among the application's other requirements, indicate where, at any time during the duration of the project, accessibility of the PPROW may be limited, eliminated or otherwise compromised, even if such accessibility barriers are expected to be present only for a short period of time. The MOT shall further provide for maintaining the accessibility of the PPROW, including by such means as providing, and indicating such by signage, alternative accessible pedestrian routes during the duration of the project. Finally, the City will enact written policies and procedures to enforce the City's current code requirements ensuring access to PPROW, including but not limited to codes regarding barriers caused by signage, tables and chairs, and other items installed or erected on or in pedestrian access routes by third-parties.

**J.    Private (Non-City) Parties Using the PPROW for Normal Business Operations**

The Consent Decree requires the City to implement and maintain policies and procedures relating to the enforcement of the City's code requirements ensuring access to PPROW, including but not limited to barriers caused by signage, tables and chairs, and other items installed or erected by third parties for normal business operations. The policies and procedures shall indicate that the City shall only allow the encroaching or obstructing the PPROW as authorized by permit whose application requirements shall also require the identification of an alternate accessible route.

### K.    Access During Special Events

The City is required to implement policies and procedures to provide alternate, accessible routes in the PPROW through and around areas where conditions during special events prohibit full access to the PPROW. The City will work with the third-party contractors and producers for special events to make reasonable accommodations for persons with Mobility Disabilities during special events including identifying temporary accessible alternative routes and posting descriptions of such routes on the City's website.

### L.    Dispute Resolution Procedure

The Parties have drafted an extensive dispute resolution procedure to the extent there are disputes relating to the requirements or interpretation of the Consent Decree. As set forth in the Consent Decree, disputes shall be brought to the attention

of the other party as soon as possible. The Parties shall then have thirty days to resolve the dispute, and if it is not resolved in thirty days, the Parties may submit the issue to a mediator. If the issue is not resolved through mediation, then the issue will be presented to the Court.

### M.    Administrative Preconditions and Approvals

The City is a municipal corporation of the State of Georgia, and as such, the City is vested with the powers granted to, and limitations imposed thereupon, municipal corporations by the laws of Georgia, and by the City's Charter and ordinances. The Parties acknowledge and agree that the City must comply with the laws of the State of Georgia, the City's Charter and Code of Ordinances including but not limited to, the City's Procurement and Real Estate Code, even when performing obligations set forth upon it by the Consent Decree. To the extent compliance with the procedures set forth in the City's Procurement and Real Estate Code cause the completion dates of obligations to be delayed, the City will not be in breach or violation of the Consent Decree provided the City gives written notice to Class Counsel and the Monitor of the delay, the reasons for the delay, the anticipated date of completion, and acts in good-faith to effect implementation as soon as practicable. This subsection of the Consent Decree is not intended to alleviate the City of any of the substantive obligations imposed upon it in the Consent Decree.

### N.    Notice of Class Action

Because class certification is sought solely pursuant to Federal Rules of Civil Procedure 23(b)(1) or 23(b)(2), notice to class members of the certification is not required and class members may not opt out. *See* Fed. R. Civ. P. 23(c)(2); Newberg on Class Actions § 8.13. Notice need not be given of the certification of the class. Federal Rule of Civil Procedure 23(e) provides that notice of the proposed dismissal or compromise of a class action shall be given to all members of the class "in a reasonable manner." In part, because of the size of the class, notice to individual class members is impractical.

Nevertheless, in the Court's Order Granting Preliminary Approval of the Consent Decree, the Court set forth the procedure for the Parties to provide notice to the Class. ECF No. 95. Specifically, "within ten (10) days after the Court's entry of the Preliminary Approval Order, Class Counsel was to mail, via U.S. Mail and/or email, the Notice of Settlement in the form of Exhibit C to the Consent Decree to all organizations identified in the Exhibit D to the Consent Decree." On February 5, 2024, the Notice of Settlement was mailed to all of the organizations identified in Exhibit D to the Consent Decree. *See* Declaration of Richard Valladares ("Valladares Declaration") attached hereto as Exhibit B at ¶ 3.[8] Further, the Court's Order Granting Preliminary Approval of the Consent Decree provided that "[w]ithin

---

[8] These Declarations constitute the statements of compliance with the notice requirements as set forth in the Court's Order Granting Preliminary Approval of the Consent Decree.

twenty (20) days after the Court's entry of the Preliminary Approval Order, the City shall cause a copy of the Notice of Settlement to be posted and remain posted on the City's official website (www.atlantaga.gov) for four consecutive weeks." A copy of the Notice of Settlement was posted on the City's official website for four consecutive weeks. *See* Valladares Declaration at ¶ 4. Similarly, the Court's Order Granting Preliminary Approval of the Consent Decree stated "[w]ithin twenty (20) days after the Court's entry of the Preliminary Approval Order, Class Counsel shall cause the Notice of Settlement to be posted and remain posted on Class Counsel's website for four (4) consecutive weeks."  The Notice of Settlement was posted and remained posted on Class Counsel's website for four (4) consecutive weeks." *See* Declaration of James Radford attached hereto as Exhibit C at ¶ 3. Further, the Court's Order Granting Preliminary Approval of the Consent Decree required the City to "cause the Notice in the form of Exhibit C to the Consent Decree to be published for four consecutive weeks in the following newspapers: *The Atlanta Journal-Constitution* (in English and Spanish), *The Fulton County Daily Report* (in English and Spanish), *The Champion Newspaper* (in English and Spanish), and *Mundo Hispanico* (in Spanish)." The City for four consecutive published the Notice in *The Atlanta Journal-Constitution* (in English and Spanish), *The Fulton County Daily Report* (in English and Spanish), *The Champion Newspaper* (in English and Spanish), and *Mundo Hispanico* (in Spanish). *See* Valladares Declaration at ¶ 5.

Accordingly, the Parties have complied with the Notice requirements of the Court's Order Granting Preliminary Approval of the Consent Decree.

### O.    Release

The release by the Class is narrowly tailored to the litigation at hand. This litigation solely releases the City from claims for injunctive or declaratory relief relating to the subject matter that was alleged, could have been alleged, or could be alleged by any class member throughout the term of the Consent Decree. The release expressly does not include claims for monetary damages, personal injuries, or property damage resulting from elements of the PPROW that do not comply with the ADA. Further, the release does not apply to claims based on accessibility barriers that remain in existence after the expiration of the Consent Decree or claims to enforce the terms of the Consent Decree. *Desue v. 20/20 Eye Care Network, Inc.,* No. 21-CIV-61275-RAR, 2023 WL 4420348, at *3 (S.D. Fla. July 8, 2023) ("The release is narrowly tailored to release only those claims that could have been brought against the 'Released Parties.'").

### P.    Attorneys' Fees and Costs

The Consent Decree provides for payment of Plaintiffs' attorneys fees and costs. Class counsel submitted an application requesting entry of an award of attorneys' fees and expenses within twenty (20) days prior to the deadline for Class members to submit objections to this Consent Decree. ECF No. 96.  The Parties have

exchanged information regarding the work performed by Plaintiff's counsel and the expenses advanced and have agreed that an award of $600,000 in attorneys' fees and costs is presumptively reasonable. Defendants have not objected to the fees and costs submitted in Plaintiff's motion. Plaintiffs' request is in compliance with the negotiated terms of the settlement agreement, the work performed is reasonable in light of the task carried out, and the hourly rates requested are reasonable, as set forth in Plaintiff's motion.

The Consent Decree further provides for payment of Class Counsel's attorneys' fees during the monitoring period of up to $625,000, upon submission of invoices, which are subject to review for reasonableness. Class counsel may apply, after fifteen (15) years for additional funds upon a showing that such funds are necessary reasonably to enforce the Consent Decree.

### R.    Objections

As required by the Court's Order Granting Preliminary Approval of the Consent Decree, each Class Member was "given a full opportunity to object to the proposed Consent Decree and Class Counsel's request for an award of reasonable attorneys' fees, expenses, and costs, and to participate at the Fairness Hearing." To date, counsel for the City and Class Counsel are not aware of any Class Members who have objected to the Consent Decree or Class Counsel's request for an award

of reasonable attorneys' fees, expenses, and costs. *See* Valladares Declaration at 7;

Radford Declaration at ¶ 5.

## III.   ARGUMENT REGARDING FAIRNESS OF THE SETTLEMENT AGREEMENT

The Parties jointly move this Court for a final order approving the Consent

Decree reached between the Parties and settling this case. Under Federal Rule of

Civil Procedure 23(e), the Court has responsibility for reviewing and approving

settlement of class action cases. In addition to adherence to adequate procedures, the

Court evaluates whether the settlement is fundamentally fair, adequate, and

reasonable. Fed. R. Civ. P. 23(e). The agreement between the Parties fulfills the

mandate of the ADA and the Rehabilitation Act by creating clear and comprehensive

guidance to ensure that the City's PPROW is accessible to individuals with

disabilities. *See Assoc. for Disabled Amer. v. Amoco Oil Co.,* 211 F.R.D. 457, 467

(S.D. Fla. 2002).

In considering the fairness of a settlement of a class action, the Court must

recognize that "compromise is the essence of settlement." *Bennett v. Behring Corp.,*

737 F.2d 982, 986 (11th Cir. 1984). To evaluate the fairness of the Consent Decree,

the Court should consider (1) the likelihood of success at trial on the merits; (2) the

range of possible recovery; (3) the point on or below the range of possible recovery

at which a settlement is fair; (4) the complexity, expense, and duration of the

litigation; (5) the substance of the objections and reaction of class members; and (6)

the state of proceedings at which the settlement is achieved. *Id.; see also Columbus Drywall & Insulation, Inc. v. Masco Corp.,* No. 1:04-cv-3066-JEC, 2012 WL 12906499, at *2 (N.D. Ga. Oct. 26, 2012). A class action settlement should be approved so long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett,* 737 F.2d at 986.

The Parties agree that the projected outcome of the litigation is uncertain and final approval of this settlement would promote judicial economy because litigation, trial, and a potential appeal of this matter would demand significant resources from the Parties and the Court, including fact and expert discovery, as well as data analysis. This case involves questions of law regarding, among other things, the application of the statute of limitations governing claims brought pursuant to Title II of the ADA to alterations previously performed by the City that were allegedly not in compliance with the Accessibility Standards, which could create a risk as to how robust and compressive the injunctive relief could be. The final approval of the settlement solves this issue.

A trial on the merits of the issue regarding the accessibility of PPROW and curb ramps would require an analysis of thousands of curb ramps and hundreds of miles of sidewalk to determine if those sidewalks and curb ramps comply with the ADA and the Rehabilitation Act either by literal conformance with the Accessibility

Laws and/or Accessibility Standards, or by providing program accessibility.[9] Testimony relating to the many curb ramps along with enormous amount of square footage of sidewalk would be unwieldy. Additionally, even if the sidewalks and curb ramps do not comply with the ADA or the Rehabilitation Act by conforming to the Accessibility Laws and or Accessibility Standards, or by providing program accessibility, Plaintiffs still must demonstrate through admissible evidence that it is technically feasible for the City to make the alterations they are requesting for each sidewalk and curb ramp they are contending needs alterations. Rather than taking this case to trial, the modifications proposed by the Consent Decree will provide the disability community with immediate and sustained relief, provide for judicially enforceable modifications, and guarantee several forms of relief which might not otherwise be available at trial, such as an accessibility coordinator devoted to the Department of Transportation, prioritization of PPROW corridors that the disabled community has identified, and a narrowly tailored released as opposed to *res judicata*.

In addition to the matters discussed above supporting final approval of the Consent Decree, the Consent Decree is not the product of collusion, as class counsel and counsel for the City have vigorously represented their respective clients' interests. Throughout this litigation, the Parties have exchanged discovery regarding

---

[9] *See* 28 C.F.R. § 35.150(a) and (b).

a recent audit of the City's sidewalk infrastructure, the costs associated with implementing a plan to repair the City's PPROW, and how the City proposes to pay for repairs to the City's PPROW. Class counsel, along with their expert, personally inspected the PPROW throughout representative areas of the City. Further, the Parties each retained experts qualified to render opinions regarding the accessibility of the City's PPROW. Counsel for the Plaintiffs conferred extensively with the Plaintiffs during the long course of intensive settlement negotiations spanning multiple years. The proposed resolution of this case is based on Plaintiffs' expert's inspection of various sections of the City's PPROW, confirmation inspections of the same sections of the City's PPROW by the City's independent expert, relevant information provided during discovery, the experts' review of the PPROW, and extensive detailed discussions and negotiations among Plaintiffs, Defendants, experts, and attorneys regarding the implementation of certain policies and modifications that might be made to the City's PPROW to increase its accessibility to individuals with disabilities.  Notwithstanding these efforts, settlement could not be reached without the assistance of retired Judge Dax Lopez, who was sought out by counsel for the Parties to mediate a number of the most contentious terms of the Consent Decree without which this matter may not have settled. The need for mediation to reach a settlement further demonstrates the lack of collusion among the Parties. The terms agreed to were the product of arms-length negotiations, with

independent counsel and consulting experts. As detailed above, the terms of the resulting Consent Decree require the City to make numerous and substantial modifications to the sidewalks and PPROW, including to the policies related thereto, thereby greatly enhancing the accessibility of the City's sidewalks and PPROW for all persons with disabilities.

The fact that the Plaintiffs have been able to obtain such broad relief is indicative of the parties having negotiated in good faith at arms' length. *Amoco Oil Co.,* 211 F.R.D. at 470-471; *see also* Valladares Declaration at ¶ 7; Radford Declaration at ¶ 6. This Court is entitled to rely upon the judgment of experienced counsel, as well as the Plaintiffs. Here, counsel for the Plaintiffs has experience both in litigating matters involving the ADA and the Rehabilitation Act, as well as class actions. *See, e.g., Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977); *see also Ingram v. The Coca-Cola Co.,* 200 F.R.D. 685, 691 (N.D. Ga. 2001); *see also* Radford Declaration at ¶ 8. The notice to the class, under all circumstances, provided Class Members with the reasonable notice of the settlement. *See Faught v. Am. Home Shield Corp.,* 668 F. 3d 1233, 1239 (11th Cir. 2011) (citing *In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1104-1105 (5th Cir. 1977)).

Typically, notice by publication is regarded as sufficient to encourage those with divergent views to come forward to help the trial court identify possible inadequacies in the settlement. *Greco v. Ginn Develop. Co., LLC,* 635 Fed. Appx.

628, 634-635 (11th Cir. 2015); *Faught*, 668 F.3d at 1239 (11th Cir. 2011). Such notice by publication is adequate and plainly would encourage individuals who disagreed with the Consent Decree to come forward and to identify any perceived inadequacies in the Consent Decree. Publication was reasonably calculated to reach a representative cross-section of members of the disabled community and their advocates. The notice "amply accomplished the purposes for which due process requires such notice, namely, to 'assure that before settlements receive judicial approval the court be well informed of the views of those who feel that they are being called upon to make the sacrifices.'" *Battle v. Liberty Nat'l Life Ins. Co.,* 770 F. Supp. 1499, 1521 (N.D. Ala. 1991), *aff'd* 974 F.2d 1279 (11th Cir. 1992), quoting *Mandujano v. Basic Vegetable Prods., Inc.,* 541 F.2d 832, 835 (9th Cir. 1976).

As of the date of filing and after Notice was provided, the Parties have not received any objections. This fact further supports final approval of the Parties' Consent Decree.

**WHEREFORE,** the Plaintiffs Laurel Lawson, James Curtis, and James Turner, individually and on behalf of all those similarly situated, and Defendant the City of Atlanta, Georgia, respectfully move this Court for a final order (a) approving class certification under Fed. R. Civ. P. 23(b)(2); and (b) finding the proposed Consent Decree is fundamentally fair, adequate, reasonable, and not the product of

collusion between the Parties, and satisfies all of the factors set forth in *Bennett,* 737

F.2d at 986.

Dated: April 25, 2024

**COUNSEL FOR PLAINTIFFS**

<u>/s/ Andrew Y. Coffman</u>
Andrew Y. Coffman
Georgia Bar No. 173115
A. Lee Parks, Jr.
Georgia Bar No. 563750
J. Daniel Cole
Georgia Bar No. 450675
**PARKS, CHESIN & WALBERT, P.C.**
1355 Peachtree St.NE
Suite 2000
Atlanta, GA 30309
Telephone: 404-873-8000

acoffman@pcwlawfirm.com
lparks@pcwlawfirm.com
dcole@pcwlawfirm.com

<u>/s/ James E. Radford</u>
James E. Radford
Georgia Bar No. 108007


Georgia Lord
Georgia Bar No.  447932
**RADFORD SCOTT, LLP**
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, GA 30030
Telephone: 678-271-0300
jradford@radfordscott.com
glord@radfordscott.com

**COUNSEL FOR DEFENDANT**

**GREENBERG TRAURIG, LLP**
Terminus 200, Suite 2500
333 Piedmont Road NE
Atlanta, Georgia 30305
Telephone: (678) 553-2100
Facsimile:  (678) 553-4745

/s/ Richard J. Valladares
RICHARD J. VALLADARES
Georgia Bar No. 611066
Valladaresr@gtlaw.com

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile:  (305) 579-0717


ROBERT S. FINE (*pro hac vice*)
Florida Bar No. 155586
Email: FineR@gtlaw.com
ROBERT S. GALBO (*pro hac vice*)
Florida Bar No. 106937
Email: GalboR@gtlaw.com

### <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1D</u>

I hereby certify that the foregoing document was prepared in Times New Roman, 14-point font, as provided by Local Rule 7.1D.

s/ Richard J. Valladares<br>
Richard J. Valladares<br>
Georgia Bar No. 611066

### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing **JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION CONSENT DECREE** with the Clerk of Court using the CM/ECF system which will automatically send electronic notification of such filing to all counsel of record:

This 25th day of April, 2024.

s/ Richard J. Valladares<br>
Richard J. Valladares<br>
Georgia Bar No. 611066

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| LAUREL LAWSON, JAMES CURTIS, and JAMES TURNER, on behalf of themselves and other similarly-situated persons, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE NO. 1:18-cv-02484-SDG |
| v. | ) ) | |
| CITY OF ATLANTA, GEORGIA, | ) ) | |
| Defendant. | ) | |

## [PROPOSED] FINAL JUDGMENT AND ORDER APPROVING CLASS ACTION SETTLEMENT

WHEREAS, on April 30, 2024, at [TIME], the Court held a hearing (the "Fairness Hearing") to determine, among other things, whether the settlement in this action between Defendant City of Atlanta, Georgia (the "City") and Plaintiffs Laurel Lawson, James Curtis, and James Turner (collectively, the "Plaintiffs"), as set forth in the Consent Decree, a copy of which is attached hereto as Exhibit 1 (the "Consent Decree"), is fair, reasonable, and adequate, such that an Order of final approval should be issued and a final judgment upon said Consent Decree should be entered by the Court,

WHEREAS, the Fairness Hearing was attended by the Parties, through their respective counsel of record in this action, and by such other individuals and entities as set forth in the record in this matter.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.    The Court, for the purposes of this Judgment, adopts the terms and definitions set forth in the Consent Decree.

2.    The Court has jurisdiction over the subject matter of this action, Plaintiffs, the Class, the Consent Decree, and the City.

3.    The Court finds that the Notice of Proposed Settlement of Class Action Lawsuit ("Settlement Notice") notified the Class of the pendency of this action and of the proposed settlement and was disseminated by each of the means required under the Consent Decree and the Order Granting Preliminary Approval of Class Action Settlement (ECF No. 95) dated January 25, 2024, and was otherwise fully implemented.

4.    The Court finds that the Settlement Notice, as ordered and implemented, was reasonably calculated under the circumstances to apprise the Class Members of the pendency of this action, all material elements of the proposed Settlement, and their opportunity (a) to submit written objections to the Settlement, and (b) to appear at the Fairness Hearing to object to or comment on the Settlement.

The Settlement Notice was reasonable and the best notice practicable to all Class Members and complied with the Federal Rules of Civil Procedure, due process, and all other applicable laws and rules. A full and fair opportunity has been afforded to the members of the Class to participate during the Fairness Hearing, and all other persons wishing to be heard have been heard. Accordingly, the Court determines that all members of the Class, as set forth below, are bound by this Judgment.

5.    On January 25, 2024, this Court appointed Plaintiffs as Class Representatives of the Class, and appointed James Radford of Radford Scott LLP and Andrew Coffman of Parks, Chesin & Walbert, PC as Class Counsel to represent the Class.

6.    On January 25, 2024, this Court provisionally certified the following Class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), based on the findings in the Order of the same date: "All persons who have, or will have, a Mobility Disability and who have been or will be denied equal access to pedestrian rights of way in the City of Atlanta at any time up through the expiration of this Consent Decree as a result of the City's policies and practices with regard to design, installation, repair, and maintenance of its pedestrian rights of way." This Court finds that the Class continues to meet the requirements for class certification under the Federal Rules of Civil Procedure and all other applicable laws and rules.

7.      In particular, the Court finds that: (a) joinder of all Class Members in a single proceeding would be impracticable, if not impossible, because of their numbers and dispersion; (b) there are questions of law and fact common to the Class; (c) Plaintiffs' claims are typical of the claims of the Class that they seek to represent for the purposes of settlement; (d) Plaintiffs have fairly and adequately represented the interests of the Class and will continue to do so; (e) Plaintiffs and the Class are represented by qualified, reputable counsel who are experienced in preparing and prosecuting class actions, including those involving the sort of practices alleged in the Amended Complaint; and (f) the City acted or refused to act on grounds that apply generally to the Class, so that declaratory and injunctive relief is appropriate.

8.      Class certification is therefore an appropriate mechanism for protecting the interests of the Class and resolving the common issues of fact and law arising out of Plaintiffs' claims while also eliminating the risk of duplicative litigation. Accordingly, the Court hereby makes final its earlier provisional certification of the Class and further confirms the appointment of the Class Representatives and Class Counsel to represent the Class.

9.      The Court grants final approval of the Settlement set forth in the Consent Decree and finds, after considering all of the factors set forth in Federal Rule of Civil Procedure 23(e)(2), that it is fair, reasonable, adequate, and in the best interests of the Class as a whole. The Settlement, which was negotiated at arm's

length, offers Class Members comprehensive injunctive relief regarding all of the claims in Plaintiffs' Complaint, and treats Class Members equitably relative to each other. The Court grants final approval of the release of the City from the Released Claims as set forth in the Consent Decree.

10.    The Court further finds that the City's obligations as set forth in the Consent Decree are proper and reasonably calculated based on the available information to provide people with Mobility Disabilities access to the City's pedestrian public rights of way. Accordingly, the Settlement shall be consummated in accordance with the terms and conditions of the Consent Decree.

11.    No Class Member has objected to the Settlement. The absence of any objections further supports the Settlement's final approval.

12.    The Class Representatives and all Class Members (and their respective heirs, assigns, successors, executors, administrators, agents, and representatives) are conclusively deemed to have released and forever discharged the City from all Released Claims as set forth in the Consent Decree. The Class Representatives and all Class Members are bound by this Judgment.

13.    The benefits described in the Consent Decree are the only consideration, fees, costs, and expenses that the City shall be obligated to give to any party or entity, including without limitation, the Class Representatives, the Class

Members, and Class Counsel in connection with the claims released in the Consent Decree and/or the payment of attorneys' fees, costs, and expenses in this action.

14.    The Consent Decree and this Judgment are not admissions of liability or fault by the City, or a finding of the validity of any claims in this action or of any wrongdoing or violation of law by the City. The Consent Decree is not a concession by the Parties and, to the fullest extent permitted by law, neither this Judgment, nor any of its terms or provisions, nor any of the negotiations connected with it, shall be offered as evidence or received in evidence in any pending or future civil, criminal, or administrative action or proceeding to establish any liability of or admission by the City.

15.    Notwithstanding the foregoing, nothing in this Judgment shall be interpreted to prohibit the use of this Judgment to consummate or enforce the Consent Decree or Judgment, or to defend against the assertion of Released Claims in any other proceeding, or as otherwise required by law.

16.    In accordance with the terms of the Consent Decree, which is attached hereto, the Court reserves exclusive and continuing jurisdiction over Plaintiffs, the Class Members, the City, and the Consent Decree throughout the term of the Consent Decree, for the sole purpose of supervising the implementation, enforcement, construction, and interpretation of the Consent Decree and this Judgment. In that regard, any challenges to the Consent Decree's terms or implementation, whether

under state or federal law, shall be subject to the exclusive and continuing jurisdiction of this Court.

      **IT IS SO ORDERED.**

SO ORDERED, this _____ day of _____, 2024.

                          _____
                          Steven D. Grimberg
                          United States District Judge

Copies furnished to:

All counsel of record